Case numbers 145721, 145722. United States of America v. Joshua Dobson and Paul Gott III. Arguments not to exceed 10 minutes for each defendant, 20 minutes for the plaintiff, Mr. Stryance for the appellant. Good morning, Your Honors. Peter Stryance at Asheville Bar here on behalf of Defendant Appellant Joshua Dobson. I would like to reserve two minutes for rebuttal at this point in time. I did not try this case, Your Honors. I was hired after the sentencing and have been representing Mr. Dobson on appeal. I wanted to talk about the issue that I framed as issue number one in my brief, and that was the attorney-client privileged... That privilege, though, goes to Mr. Gott, doesn't it? I know that's the government's insistence, Your Honor, but I think it's... Well, who represented Mr. Gott? Mr. Gott was represented by Mr. Cabot, who is here today. Cabot on appeal and a man by the name of McDougal from the Represented by... The name slips my mind because I have it written down here, but he was represented by the lawyer and that lawyer sent the material by mistake. Why does your client, Mr. Dobson, have any standing on that particular issue? I think he has standing based on the government's own admission that it was Mr. Dobson's issue as well when they filed the motion. Well, it could affect Dobson, that's true, but why is it his issue? In other words, Gott at any time could have waived the attorney-client privilege, Dobson couldn't do anything about it. Well, there was absolutely... Because there was no attorney-client relationship between Dobson and the lawyer. Well, they were charged as co-conspirators. Correct. Mr. Piper characterized these statements as statements in furtherance of the conspiracy. Yes. Mr. Piper advised Judge Collier, the district court judge, that this was Mr. Dobson's issue as well. It could affect him, I agree, but if I don't see that he has standing to raise it specifically, in other words, it was not his privilege, was it? But he is... It was not his privilege, was it? It's not his privilege per se, but he was impacted by the breach of the privilege by Mr. McDougall, the trial counsel for Mr. Gott. The court has had the opportunity to see those three or four pages that were, according to Mr. Dougall, inadvertently included in a reciprocal discovery production, and Mr. Dobson is mentioned prominently in that email, and it gives... I know that the defendants characterized it as a roadmap of what the theory of defense would be on those three gift letters, which, by the way, both Mr. Gott and Mr. Dobson were convicted of. The government candidly characterized it as Dobson's issue, and they even told Judge Collier that they felt like the effect of the email was to throw Mr. Dobson under the bus. I know that the government would like to have this issue as to... He could have thrown him under the bus with his proffer as well. I mean, there are a lot of ways Gott could have thrown Dobson under the bus. But Mr. Gott did not end up testifying. That proffer was not used against Gott, as far as I could tell from my reading of the trial transcript. So we're dealing with Mr. McDougall's privilege by the inclusion of those documents. Okay, well, even if you assume that he had, I guess, standing to raise this issue because he was impacted by it, the judge prohibited the material from being used in the the trial. So what prejudice came from that statement, and what use was made of it, either directly or indirectly? I think what Judge Collier tried to fashion was a prohibition on direct use, that it could be not used in the government's case in chief, it could not be used to cross-examine Mr. Gott. But that did not address the question... And it wasn't used to cross-examine, was it? I'm sorry? It was not used to cross-examine, and it wasn't used directly, correct? It wasn't directly used to cross-examine, but I think Mr. Piper was very candid with the court. He said that he had read that information and it was burned into his consciousness, and he didn't know if in the course of the give-and-take of cross-examination of a witness that it might creep into his consciousness. And that was, in my view, the flaw and the deficiency in Judge Collier's ruling. Although he tried to fashion a remedy for direct use, there was no remedy fashioned for derivative use. And I thought it was interesting... But McDougall also said that he had already talked with Smart and basically didn't learn anything. Although, having seen what, you know, Gott said, that was burned into his brain. I'm not sure that Mr. McDougall, with all respect, was really understanding the hypothetical questions that Judge Collier was putting to him during that colloquy. The judge put a very important question to him squarely about derivative use. Would it be a fair use of that information if the government took the information in that email, which was found to be, by the judge, privileged and confidential attorney-client material, conceded by the government to be attorney-client material, the government characterized it as incriminating material, but the judge asked Mr. McDougall, would it be a fair use for the government to pick up the telephone or send an agent out to interview those three bankers that they had never heard of before? And I think you can tell by Mr. McDougall's response to Judge Collier, he didn't understand the impact of the derivative use. Did they, in fact, do that? The government, did they, in fact, go out and talk to bankers they never heard of before? That would be a question for Mr. Piper, but I think that's the danger of the way that the issue was handled. They're all per se rule. If one, if a lawyer for the defendant sends information, privileged information, to the prosecutor, the prosecutor must disqualify. No, but I think there needs to be a more probing, searching. He spent two hours. I, you know, I went through that. I have to say, I couldn't think of a single question that was not asked by Judge Collier. Now, you've got some, perhaps. But I think the deficiency really goes in the non-evidentiary use, the derivative use. How is Mr. Piper, to use his words, going to unring the bell? He is in possession of material that is clearly attorney-client privileged material. Given the actual trial, can you point to anything that you would characterize as derivative use? Well, it's, it's a little muddled and murky, to be honest with the court. We don't know what motivated Mr. Piper to make decisions as to who he was going to call as a witness, what questions he would put to that witness, how he would fashion his cross-examination. Those are all examples of the non-evidentiary derivative use. But I take it you, you can't, you, at least you have not pointed to something that happened at trial and even speculate that that was helped by this material. I can't do that because I can't divine what was in Mr. Piper's... Sure, I understand, but you know, there might be occasions where you would, so that was why I was asking. But I think the remedy of just saying, well, you can't use the document that you've read and that you've adopted and it's in your memory, is an insufficient, is an insufficient remedy. I think that what should have happened is one of two things. There should have been a more probing evaluation of the issue by Judge Collier on the issue of non-evidentiary use and the issue of derivative use by having the government go through some line by line or some exercise with him to assure him that no non-evidentiary use of the material had been used and that simply wasn't done. The counsel didn't ask for anything particular of that sort, did they, before Judge Collier? I mean, you could imagine, at least the way you're talking, if you had been counsel, you might have said, and we want them to promise this and we want them to promise that. That didn't happen. It didn't happen and I think that the court should also be aware that Mr. McDougall, with all respect to him, he had his own agenda. He wanted to make sure that the court did not perceive this as a serious issue because he was the one in the barrel. He was the one that had inadvertently, to my privilege, material. So, of course, he's going to say, nothing to see here, everything's fine, and then I think you could glean from the colloquy between the court and the defendant, Mr. Gott, that Gott had some real misgivings and Mr. Piper, to his credit, had checked with the DOJ, Office of Professional Responsibility, the local Tennessee bar, the Board of Professional Responsibility. Thank you, counsel. I think your time has expired, unless my colleague can take anything further. Thank you. You'll have your two minutes for rebuttal. Please, the court, I'm John Cavett from the Chattanooga Bar. I'd like to reserve two minutes for rebuttal. I also need to tell you I wear hearing aids and this is not a good room for that, so I may have a little bit difficulty hearing. If I do, I'm sorry. Speak up if you don't hear us. Inevitably, one of them has chosen not to work very well today, which is par for the course. I did not represent Mr. Gott at the trial either. First of all, I think there's a couple of things about the context of this that are important. The first is that when Mr. McDougall, who was a second lawyer to represent Mr. Gott in the case, he asked Mr. Gott, send me a narrative of the case. Tell me what it's about, what you did, everything you know about it. That is the email that was inadvertently disclosed. It was a crucial email. Of all the pieces of paper in Mr. McDougall's file, I'm certain that would have been the most important to keep secret, and so that, you know, it goes to the level of the problem here. The other thing is that they focused on two pieces of information that were in that email. One was a conversation that Mr. Gott had with Mr. Smart, who was a banker. Mr. Gott believed that Mr. Smart had told him it's okay to do these gift letters. The other was that the email said that, by the way, I talked to three other bankers who said I couldn't do it, and Mr. Gott's only defense at trial was, I did not realize what I was doing was illegal. So the fact that he had talked to three other bankers who said it is illegal, if known by the government, would destroy his only defense. So it's a very important issue that was brought up. Mr. McDougall had a duty to do something once he realized that he had sent this email. He did nothing. The United States seems to be the only party, oddly, maybe not oddly, but the only party that seemed to take an interest in protecting Mr. Gott. So it filed this judicial inquiry, and from that point on, it seemed to focus on the question, the issue involving Mr. Smart, and very little was ever said about the three bankers, the most important piece of evidence, except time and again by Mr. Piper, and at one point, and I think Mr. Stryans is right, Mr. McDougall had a conflict of interest. He was clearly worried about what he had done. So his first statement to the court was, Judge, the government already knows all this information. Well, how? Somebody else told them. He's relying on a proffer that he wasn't part of. It was a proffer with his prior lawyer, plus the one party that was... Somebody else, would that have been Smart himself? Did they interview... I'm sorry, Your Honor, what I meant, that wasn't clear. What I meant was Mr. Gott's first lawyer had a proffer with Mr. Gott with the government. Mr. McDougall, the second lawyer, says the government already knows about all this stuff, but the government said no, we didn't know this. We certainly didn't know about the three bankers. So at that point, there's clearly a conflict of interest there, and Mr. McDougall is not representing his client. Second thing Mr. McDougall says, or it's part of the first, he says, there's no harm because they already knew it. At one point, the judge was talking about the Smart statement, and he said, is this the only real problem in this case? Is this the sum total? And Mr. McDougall said, yes. The next line in the transcript, Judge looks at Mr. Piper, says, Mr. Piper, you have a shocked look on your face. Mr. Piper says, well, I was shocked by the words sum total. In other words, the government was trying to tell the judge that there's a lot more important information that was disclosed here, and it just never got discussed. It was Mr. McDougall's duty to bring that up, and he did not do that. So at that point, I don't believe Mr. Gott's being represented very fairly, and that Mr. McDougall has a vested interest. The second thing, and this has been touched on, that the judge said to Mr. McDougall is, well, what's the remedy? What remedy do you want? And he says, I don't want them to be able to use the email in their case-in-chief, okay? He didn't seem to care that that left it open for the prosecutors to grill Mr. Gott if he took the stand about these three bankers. That also didn't take any consideration in the fact that they had the information, and Mr. McDougall seemed to be concentrating on the document. It's the information that's important. Now the prosecutor knows the most crucial detail of the only defense that Mr. Gott has. I'll ask you the same question I asked Mr. Stryance. Can you point to that the government was advantaged in some way in what they did in a question, in a cross-examination, in a tactical decision? I have a response. It's not as concrete as that, and thank you for using the word speculative. Maybe it is, but here's the thing. The one thing Mr. McDougall did that I think was not going to let the government use this document in its case-in-chief, which meant that they were perfectly able to cross-examine him about it. The judge said, I'll take up that issue later, but when the trial came along, Mr. McDougall put Mr. Gott on the stand. He asked him about the three bankers. Now I would have done that too. If you know that something bad is going to come out in the trial one way or the case and sort of act like it's not a big deal and take the sting out of a little bit. So my response is that it looked to me like the lawyer had to change his tactics because of this ruling. And you think that Gott would not have been asked on direct about the three bankers. Is that sort of the guts of it? That's not, I can't say. A minute ago you said you would have asked him as well, but I thought you meant you would have asked him under these circumstances. I would have. If I was going to trial with somebody and I knew that these three bankers, I as his lawyer would have brought it out. You're asking me, would Mr. Piper have thought to ask that question? And I don't know the answer to that. If I had to speculate, I'd say very well might. The question is, did Mr. Gott's constitutional rights to a fair trial? At the trial, did they then cross-examine at all with respect to the bankers? I don't recall, your honor. I'm sorry. I wasn't there, but I probably will. I do know that it was already out of the bag. So just a minute, Gott did testify then? Yes, your honor. I thought Mr. Streontz said he did not testify. I'm sorry, your honor. I couldn't hear you. I couldn't hear you, your honor. Okay, I thought your co-counsel said that Gott did not testify. I think he was saying that Mr. I might have misunderstood him. I'm not sure, your honor. He did say that. My time's up. Thank you. Anything? It says zero. Okay, thank you, counsel. You'll have your two minutes for rebuttal. May it please the court, I'm Perry Piper. I'm an AUSA in Chattanooga. With respect to these issues, Mr. Cavett, I'd like to address his statement first. During the motion for judicial inquiry hearing that we had before Judge Collier, I informed Judge Collier that I don't like to pat myself on the back, but I think I said that I'm a fairly aggressive cross-examiner, and I would have asked Mr. Gott, well, was Mr. Smart the only person that you talked to about these gift loans coming from non-family members? We had already interviewed a fellow named Chris Shoemake, who was a banker who, as I recall, had three or four files sitting on his desk that Mr. Gott never followed up on, because he was trying to do gift loans through non-family members. I do believe, your honor, that the aspect of him talking to three or four other bankers was briefly mentioned during cross-examination, but it certainly was not my focus. But I already had informed— Shoemake, one of the three that's referred to in the documents? Mr. Gott does refer to Shoemake specifically and says that—and I can read the line to you from the email—I randomly called several mortgage companies and asked if anyone had a program whether Seller could contribute to the down payment. All of them said no. The government has a statement from Chris Shoemake that will confirm this. So you had already spoken to Shoemake? Mr. Gott's conceding that we had already turned over in discovery this idea, as well as Keith Smart. We had talked to Keith Smart on several occasions. I actually was the person who subpoenaed Mr. Smart. Mr. Gott called him as a witness before we would have called him on rebuttal, and I'm not certain that we would have indeed called him on rebuttal. But in any event, I did tell Mr. Gott and I told the court during the hearing that I'm certain that I would have Mr. Gott if he had talked to other mortgage lenders about a gift loan program that came from the Seller. One of the prosecutors, it may have been you, did indicate that after—I mean, referencing to having seen the inadvertently disclosed document—that you couldn't unring the bell. So that might very well mean that having that knowledge embedded somewhere that you're going to trade on that knowledge, perhaps throughout the trial, even though you may not stand up and hold a document up. Is that a fair interpretation of the import of that statement? It was me who said it, Your Honor. Let me make the record clear. I think the fair import is close to that, respectfully. I don't know that I was talking about whether I was going to trade on that information. The information that I think then and I think now that is most damning to Mr. Gott and to Mr. Dobson was the fact that Gott stated in this email to Mr. McDougal that he talked to Smart, who told him that the bank did not care where the down payment came from as long as it was from a family member. This is Gott saying this to Mr. McDougal in the email that we got. And that's what I was talking about. It would be difficult to unring the bell on that. Now, understand this. We had already talked to Smart. Smart was adamant that he never told anybody that the seller could provide the down payment. In fact, he was adamant on his direct examination when Mr. McDougal had him on the stand that he, in fact, told them that the gift must come from a family member. So I do think that's a fair characterization. I'm reluctant to say that I would trade on that information, Your Honor, but I do think it's a fair characterization that I did say it would be difficult to unring the bell because I knew what Smart was saying. And now that we, in fact, did have confirmation that Mr. Gott was agreeing with what Mr. Smart said. So that's what made it incriminating. And in fact, that's what makes it fraud, candidly. So it's an important element of their intent. There's absolutely no question. So is this sort of upshot here that you're saying that you already had the evidence or evidence that you could use from Smart, but now you would really believe it? I mean, as I was going through it, that's why I keep asking about what actually happened at trial. And I don't see much that to the extent that it solidified your belief in your own case. Is that fair? Well, I believed it before, Your Honor. And I think it probably did help to solidify it, but I believed it before. And anybody who's ever bought a house knows that the seller can't make the down payment or part of the down payment. It's absurd, and that's what makes it fraud. I believed it then. This is the sad part for the government here is that this has created an issue, and it's an interesting issue. I haven't been a lawyer that long, 26 years, but it's the first time I've had to argue this kind of case. And it's created an issue, and what I would respectfully submit is an otherwise fairly routine mortgage fraud case. The issue here is that we received some information that was incriminating, and that's the reason why we filed the motion for judicial inquiry. I will say that Judge Collier went down every path that he could. He prohibited us from using it in our case in chief. He prohibited us from using it in cross-examination, but said that I would leave it open for the purposes of impeachment. First and foremost, we've never used this information. I never used this information again. I only looked at it twice. The first day that Mr. McCoon had received it and came into my office and said, quote, hey, look at this, which had been a good reason for me not to look at it. And secondly, when I was talking to PREO, the Professional Responsibility Advisory Office, I explained to them what was in the letter. Beyond that, I never looked at it again until Mr. Dobson's sentencing counsel raised it as an issue for a variance or departure. And that's the next time I looked at it. But again, I think that was where my unring the bell comment came from, Your Honor, was that, you know, you see something like this and it's kind of like your spouse telling you he or she's out the door. You probably are not going to forget that kind of statement. And it's just one of those things that happens and you can't quite put it out of your mind. But I would respectfully submit that we've never used this information in any scenario, even though Judge Collier stated that he would leave it open to impeachment. And Mr. Gott testified completely inconsistently, 100 percent inconsistently, with this email. He got up and said Smart told him the letter can come from anyone and it didn't have to be a family member. He stated that. And I never said, well, didn't you tell Mr. McDougall? Or I never went to the court at sidebar and say, Judge, you said we could use this for impeachment. We did not. Now, in fairness, there was a ton of evidence against Mr. Gott and Mr. Dobson about these fraudulent gift loan letters. Charlene Conner was a lady that was paid to pretend to be the relative of people who were buying property. So I don't necessarily believe that this was a big issue, but I would submit that this information has come to us inadvertently that hopefully we did the right thing with respect to it. And the defendants cannot show prejudice. They can't even show derivative use prejudice because we already had the information from Smart. We'd already talked to Chris Shoemake. And we had a mountain of other information showing their intent and their fraudulent actions. Now, I will agree with you, Judge Boggs, that it did, in my heart of hearts, it confirmed for me that this was fraud. But the other information in the case, the other evidence was overwhelming with respect to their intent to defraud. I will note for the court that there was a good case out of the District Court in Michigan, Marlinga, that talks about the two-prong test, and it's in my brief, whether the defense must show an intentional intrusion, which even the defendants concede we do not have in this case, and prejudice. We certainly cannot show an intentional intrusion. And I would also invite the court to a case called Lenars. I had it in my brief, but I think I was about 250 words shy of my limit, so I cut that. Lenars is a Connecticut case. It's a state court case in Connecticut. It's footnote 10. May I step back to my table? Thank you. Just don't talk, because we won't hear you. And that can be found at 22 Atlantic 3rd 536, pinpoint site 539, footnote 10. And the reason why I'm inviting the court's attention to this is that they talk about the conjunctive versus the disjunctive for the two prongs, active intrusion and the prejudice prong. And the Lenars case, the Connecticut Supreme Court says you only need to prove one or the other. Marlinga, the district court case out of Michigan seems to suggest that first the defendant's hurdle is that they would have to prove an active intrusion, that we sent somebody in to get the information, which obviously we did not do. But that footnote 10, some state court judge or probably his or her law clerk did a really great job of researching that issue and laid out the case law very well on that. So I would invite the court's attention to that case. Mr. Cabot said that the lawyer had to front the other bankers. I'd already given notice to Mr. Gott. And the irony here is I believe that Mr. Gott was able to hear much more about my planned cross-examination of him three weeks before the trial than we were able to use. We some benefit to Mr. Gott doing this. Lastly, I would say that as a policy matter, if we're going to relieve a prosecution team for this, then every time, and I can't imagine any defense counsel would be so duplicitous as to do this, but every time a prosecutor inadvertently receives material that's incriminating and we were to be relieved, and in this case it's not used against the defendant, then that would be a difficult policy for the government to follow. The entire white-collar division in Chattanooga, both of us tried this case. And we were a small office and we had put a lot of effort into it and prepped it and had a lot of witnesses. And the trial took about, I think, eight or nine days, and the sentencing hearing was six days. So it was a long, lengthy, and difficult process. But I don't believe that the remedy, as Judge Collier noted, the drastic remedy of removing, excuse me, the radical remedy of removing the prosecution team was not appropriate. There are no questions. Thank you. Thank you, counsel. Giants, you have two minutes for rebuttal. Judge Quist, I did not mean to give the impression that Mr. Gott didn't testify. If I said that, it was certainly not my intention. I might have misunderstood you, because my recollection coming up here was that Gott did testify. Absolutely. And I thought, ooh, I'm wrong about that after I misunderstood you. As long as you've mentioned my name, would you tell us the prejudice that resulted or occurred to your client because of this? I think the prejudice is that both Mr. Gott and Mr. Dobson had a reasonable expectation that privileged communications, which now the government characterizes as incriminating, would not be shared with the government. I think it's a little disingenuous for Mr. Piper to suggest that if you all write an opinion that gives some relief to these defendants, that the floodgates are going to be open, that all these unscrupulous, unethical criminal defense lawyers, and I was a former AUSA. That's a theoretical situation. In this case, how was your client, Mr. Dobson, prejudiced? I think he was prejudiced because the government was able to make non-evidentiary, derivative use of this information that was contained in that email. And this notion that Mr. McDougall was trying to sell to Judge Collier that, oh, there's no problem, the government knew about all of this anyway, it's just not accurate and it's not borne out by the record. Mr. Piper at the hearing said that he did not know, I'm talking about the March 2013 hearing, did not know anything about these three bankers. There was an affidavit that was filed by Mr. Dobson's trial counsel that's found at page ID number 2398, an affidavit of Mr. Townley, who said that this notion that McDougall was saying that all the information was already known to the government was not borne out by his discussions with Mr. McCoon, the co-counsel for the government. Mr. Piper mentioned something about this in response to something Judge Donald had asked about this unringing the bell comment, and he seemed to characterize it as coming up in post-trial sentencing. It came up twice in his very candid colloquy with the court at the motion for judicial inquiry, page ID number 438, hard to unring the bell, page ID number 472, bell can't be unrung. Any other questions? I think your time's expired. Thank you very much. Please, the court, I have just two comments. First of all, about the prejudice. When the judge made his ruling at the end of that hearing, the defense lawyer knew that that information was coming in about the three bankers. But for the disclosure, you would never have had to worry about that. No one would have known that. But at the time the trial started, the defense counsel did not know whether those three bankers might be sitting back in the jury room. So I think the prejudice is it came into the trial. With respect to Shoemake, at least, they seemed to make the case and the argument that they did know about him and they had contacted him. He is not one of the three bankers. He is not one of the three. If you look at the emails, it's clear. My point is, we can say Mr. Gott waived this issue because he brought it out on direct. I submit he did what he had to do. I would have done it, bring it out, try to take the sting out but it's still prejudice. And to say, well, I'm not going to bring it out, let the government do it so I don't feel like I waived it, would have been not a smart thing to do. The other thing I want to say, I'll sit down, is this could have been fixed easily if the judge had listened to the recommendation from the ethics people in the Justice Department and appointed Mr. Gott advisory counsel who could have gotten to the bottom of it, who would have been standing in front of Judge Edgar not worrying about a mistake he made but worrying about his client's case. And I think that these problems did result in prejudice and I don't believe Mr. Gott got a fair trial. Counsel, let me ask you your answer to my previous question. There's a point in the email, I randomly called several mortgage companies to ask, all of them said no, the government has a statement from Chris Shoemake that will confirm this. You're right. Does that seem to indicate that he is one of the three? I didn't read it that way but that certainly could be. Okay, but at least that's what we should look at if we're worrying about this point. Okay, thank you counsel. Any other questions? Okay, that case will be submitted.